Kenneth **CUNNINGHAM**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 04–96–01020–CR.

Court of Appeals of Texas, San Antonio.

Oct. 14, 1998.

Rehearing Overruled Nov. 23, 1998.

**516**

Donald H. Fidler, Jr., San Antonio, for Appellant.

Roderick B. Glass, Asst. Crim. Dist. Atty., San Antonio, for Appellee.

Before RICKHOFF, LÓPEZ and DUNCAN, JJ.

## OPINION

RICKHOFF, Justice.

Kenneth Cunningham was convicted on four counts of aggravated assault with a deadly weapon after members of the Dope Overthrowing Gangsters opened fire in a crowded park on a green Cadillac occupied by four members of the Skyline Park gang. In five points of error, Cunningham challenges the legal and factual sufficiency of the evidence; argues the admission of evidence showing the death of a peace officer was error; and that his trial counsel was ineffective, both generally and in that counsel had a conflict of interest with his client. We find that evidence of Cunningham's actions that day was sufficient to support a finding that he acted as a party, despite the fact that no one saw him shooting, and that a rational trier of fact could have so found beyond a reasonable doubt. We therefore affirm the judgment of the trial court.

### FACTS

Because Cunningham challenges the sufficiency of the evidence to support his conviction, a detailed rendition of the facts is in order.

Officer Toby Travieso of the San Antonio Police Department testified that he was patrolling in the area of Martin Luther King Jr. Park on July 31, 1994 when he heard gunfire. Travieso said he drove toward the site of the gunfire, but that the dispatcher directed him to Salado Creek where a park ranger was chasing an armed suspect. Travieso said he and his partner chased two black males along Salado Creek; when one of them turned with an object in his hand, Travieso's partner drew his weapon and fired. Both suspects fell to the ground and were cuffed; they were later identified as Terry Battle and Frederick Burkes.

At that point, Travieso said, he heard splashing in the creek, looked over and saw Park Ranger Paul Pytel splashing around in the water and screaming for help. Other officers arriving on the scene were unable to find Pytel for four or five minutes; when they did find him in the murky creek, they were unable to revive him.

Park Ranger Gabriel Escobedo next testified that he had been working in the park with Pytel and was near the bridge where the shots were fired. At the sound of the first shot, Escobedo said, he turned and saw three men with guns drawn among a group of about five. Escobedo said that while he could see only three weapons, all the men had their arms extended straight out in front of them, as if they were firing as well.

Escobedo said he and Pytel chased the five men, first in the vehicle and then on foot as they ran across a field and toward Salado Creek at the back of the park. Escobedo fell behind Pytel and lost sight of the group; however, he stayed in contact with Pytel by radio. He said he did not see Pytel again until other officers pulled him out of the creek.

Officer Ernest Trevino testified he was dispatched to the park; after a conversation with a civilian, he headed for the creek to try and cut off the fleeing suspects. Trevino said he ran into two suspects "walking fast and kind of looking, you know, over their shoulder;" one of these men was armed. Trevino drew his revolver and ordered the men to drop; he said the armed man, later

identified as Terry Battle, started to lift the gun and Trevino fired a shot. He said Battle dropped the weapon and fell to the ground (he was unhurt), and he told the other man, later identified as Burkes, to get on the ground at that point. Trevino said that at that point he heard the splash as Pytel went into the creek and could see that he was in trouble.

Trevino cuffed the suspects, took the weapon and headed for the spot where Pytel had gone in. Trevino said the creek was muddy and stirred up and it took several minutes to locate him; when he was pulled out, Trevino said he performed cardiopulmonary resuscitation but was unable to revive him.

Officer Brian Burke testified he was dispatched to aid a person hit by a bullet from the fusillade. He said the man, Lucas "Buster" Dukes, told him he heard several shots while crossing a bridge in the park, that he was struck in the leg, that he didn't realize at first that he had been shot, and that he did not see anyone with a gun.

Officer Marcus Wilhelm Booth testified he was dispatched to Martin Luther King Park, which he described as being crowded with young people drinking and listening to music. He went first to the creek where Pytel was being pulled out of the water, then to a residence where a bullet-riddled Cadillac Fleetwood was parked. While there, Booth said he talked with complainants Delvage McIntyre, Clinton Lee, William Bee and Darrell Bee, as well as the mother of one of the complainants. They told him they had been shot at as they drove down the street in front of the park. Booth said an evidence technician was summoned to process the car while Booth took the four men to police headquarters to give a statement.

Clinton Lee, one of the complainants, testified he was in the car that July afternoon with Delvage McIntyre, William Bee and Darrell Bee. He said they rode in McIntyre's car, a green Cadillac, down Martin Luther King Jr. Drive and came to a stop at a stoplight in front of the park. He said that he saw a group of men pointing at their car; he testified that the group included Terry Battle (aka T–Dog), Kenneth Cunningham (aka Baby Kenneth), Frederick Carter (aka Kool Aid), and Frederick Burke, and "Quick" (aka Donald Griffin).

Lee said they were sitting at the stoplight on Martin Luther King Jr. Drive by the park when "Quick, he started shooting and the other ones joined in." Lee said he didn't see Cunningham with a gun, but "I am assuming he was shooting because he was with his homeboys and he don't want to look like a punk." He said he saw "T–Dog, Quick and Kool–Aid" with guns that day, but added that "All that shooting going on didn't come from three guns, I can tell you that." He also said he saw Cunningham running toward Salado Creek with the other four defendants. Lee also testified that the group of shooters were in the Dope Overthrowing Gangsters, or D.O.G., and that he and the others in the car were in the Skyline Park gang, and that there was "bad blood" between the two groups.

William Dante Bee testified that he was sitting in the front passenger seat of the Cadillac that Sunday afternoon when the group decided to drive by Martin Luther King Park. He said that when their car got to the bridge just outside the park, he saw Cunningham and his friends start "throwing gang signs" at them. He said that when the car pulled up to the traffic light, the group opened fire on them. He said he ducked at that point and did not see the defendant firing at them. He said "Quick" was the first one to start shooting.

Delvage McIntyre said he was driving the Cadillac that night, and that he had just come up to the entrance to the park when "people started shooting at us." He said he did not see Cunningham at the park. He did say that, to his ear, there were more than five people shooting at his car at that point: "I have been shot at so many times I know when people are shooting." He later said that "there were more than two people shooting but I don't know who." He said one of the shots hit his car in the radiator, and that he was able to limp the car back to Bee's house, where Bee's mother called the police.

Darrell Bee said he was riding in the back passenger seat of the Cadillac that night

when it went past the front entrance of the park. He said he looked out the window and saw "Quick," "T–Dog," and "Kool–Aid" firing at them, and saw Cunningham standing with that group. Bee said Cunningham had something in his hand; when asked if that something was a gun, he said, "To my eyes yes, it did." He said he saw this when Cunningham was running with the rest of the group away from the scene of the shooting. He said one of the shots damaged the radiator, so they drove the car back to his mother's house. At that point, he said, his mother got angry and called the police.

Bee said he was in the Sky Line Park gang, along with his older brother William. He said the other group that started shooting was in the D.O.G. gang, and that there was "bad blood" between the two gangs. He also said his group was uncooperative with the police, and that they did not pick out Cunningham until later because the police did not ask about Cunningham until later.

Technician Patrick Sandoval introduced an eight-minute recording of Pytel's last communications with his dispatcher about his pursuit of the men who shot at the Cadillac. During that pursuit, Pytel told the dispatcher, "Be advised, there may be five of them; I believe all of them are armed."

Homicide detective Rene Martinez testified as to the photo line-up he showed the four complainants on August 3, 1994. He said all four identified Cunningham as being involved in the shooting, without hesitation.

San Antonio police detective John Menefee testified that he handled the investigation immediately after the incident. He testified that after the four complainants gave their statements at the police station, he brought them separately into a viewing room with a one-way mirror. He said he then brought the two men arrested that day, Terry Battle and Frederick Burkes, into the room. He said all four complainants identified Battle, but that none identified Burkes.

San Antonio evidence detective Charles Garcia said he collected a 9–mm pistol from the bank of the creek near the spot where Pytel drowned. He said the gun was empty and cocked. He also testified that he found 20 9–mm shell casings at the point where the shooting took place. He said the casings were spread out, not concentrated in one area, and that none of them appeared to have been stepped on.

San Antonio police detective Michael Anthony Garcia testified that he collected evidence from the Cadillac involved in the shooting. He said he collected some bullet fragments from the car, but that he was unable to identify the gun that fired the fragments.

San Antonio policeman Joseph MacKay testified he was a homicide supervisor who went to the scene that night. Three days later, MacKay said, one of the suspects identified "Quick" as Griffin and told him that "Quick" went into the creek in an attempt to elude pursuit. MacKay said he summoned a fire department diving team, which found Griffin's body at the bottom of Salado Creek. He also said divers found a handgun next to Griffin's body, a type of handgun different than that carried by San Antonio peace officers.

San Antonio police investigator Roy Eddie Rohrer testified he was present when the body was recovered. He said he found an empty clip in Griffin's pocket; at that point he directed divers to search for a weapon. Rohrer said the divers found the handgun a very short distance from the body; it was fully loaded.

Lucas "Buster" Dukes testified he was struck by a bullet on the night in question. He said he did not realize he had been shot until he felt the blood running out of his shoe. He said he did not see who shot him.

Richard Stengel, a firearm and tool mark inspector with the Bexar County Forensic Science Center, stated that the 20 shell casings found at the scene of the shooting were fired from the same gun—the weapon recovered with Griffin's body.

Kenneth Anthony Johnson, Cunningham's cousin, testified for the defense. He said he was with Cunningham on July 31, 1994; he said he was walking with Cunningham from his house to the park that evening. He said a group of about 20 people eventually formed, all headed for the park although not

starting from the same place. He said the group had just passed the gate into the park, and had started blending into a crowd of 500–600 already in the area, when "Quick" saw the members of the rival gang and began yelling and waving his gun around. After about 45 seconds of this, Johnson said, "Quick" began shooting at them; he said Terry Battle joined in with his own gun.

Johnson said that when the shooting stopped, the shooters took off running toward the creek while he and Cunningham took off running in another direction. He said he lost Cunningham in the crowd for "maybe 4 or 5 minutes;" at that point, Johnson said, the two of them went home.

Johnson said he did not see Cunningham with a gun that day, nor did he see Cunningham encourage or aid the shooters. He also said Cunningham often kept company with Battle and Griffin, that Cunningham was a member of the D.O.G. gang, and that the gang had a reputation for shooting people.

### LEGAL SUFFICIENCY OF THE EVIDENCE

■ Appellant's first point of error challenges the legal sufficiency of the evidence to support the jury's verdict. Legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction. *See Jackson v. Virginia*, 443 U.S. 307, 315–16, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The standard for reviewing a legal sufficiency challenge is whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 320, 99 S.Ct. 2781; *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim.App.1993), *cert. denied*, 511 U.S. 1046, 114 S.Ct. 1579, 128 L.Ed.2d 222 (1994). The evidence is examined in the light most favorable to the jury's verdict. *Jackson*, 443 U.S. at 320, 99 S.Ct. 2781; *Johnson*, 871 S.W.2d at 186. The standard is the same in both direct and circumstantial evidence cases. *Geesa v. State*, 820 S.W.2d 154, 162 (Tex.Crim.App. 1991). All of the evidence is considered by the reviewing court, regardless of whether it was properly admitted. *Johnson*, 871 S.W.2d at 186; *Chambers v. State*, 805 S.W.2d 459, 460 (Tex.Crim.App.1991); *Thom-*

*as v. State*, 753 S.W.2d 688, 695 (Tex.Crim. App.1988) A successful legal sufficiency challenge will result in rendition of an acquittal by the reviewing court. *Tibbs v. Florida*, 457 U.S. 31, 41–42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).

■ The sufficiency of the evidence is measured against the offense defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997). Such a charge would include one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restricts the State's theories of liability, and adequately describes the particular offense for which the defendant is tried." *Id.*

■ The jury is the trier of fact, and is the ultimate authority on the credibility of witnesses and the weight to be given to their testimony. *See* TEX.CODE CRIM. PROC. ANN. Art. 38.04 (Vernon 1979); *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex.Crim.App. [Panel Op.] 1981). It is for the jury as trier of fact to resolve any conflicts and inconsistencies in the evidence. *Bowden v. State*, 628 S.W.2d 782, 784 (Tex.Crim.App.1982). Even where there is no conflict, the jury may give no weight to some evidence, and thereby reject part or all of a witness's testimony. *See Beardsley v. State*, 738 S.W.2d 681, 684 (Tex.Crim.App.1987); *see also Chambers*, 805 S.W.2d at 461 (holding jury as judge of credibility may "believe all, some, or none of the testimony"). Because it is the province of the jury to determine the facts, any inconsistencies in the testimony should be resolved in favor of the jury's verdict in a legal sufficiency review. *Johnson v. State*, 815 S.W.2d 707, 712 (Tex.Crim.App.1991) (quoting *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim. App.1988)).

■ Cunningham was also charged with the offense under the law of parties. To show Cunningham liable as a party to the aggravated assault, the state had to show that he acted with the intent to assist or promote the assault, and solicited, encouraged, directed, aided or attempted to aid another person committing an aggravated assault. TEX. PENAL CODE ANN.

§ 7.02(a)(2)(Vernon 1994). Evidence is sufficient to support a conviction under the law of parties where the actor is physically present at the commission of the offense, and encourages the commission of the offense either by words or other agreement. *Cordova v. State*, 698 S.W.2d 107, 111 (Tex.Crim.App.1985); *Tarpley v. State*, 565 S.W.2d 525, 529 (Tex. Crim.App.1978). The evidence must show that at the time of the offense the parties were acting together, each contributing some part towards the execution of their common purpose. *Brooks v. State*, 580 S.W.2d 825, 831 (Tex.Crim.App.1979). In determining whether a defendant participated in an offense as a party, the court may examine the events occurring before, during, and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to commit the offense. *Beier v. State*, 687 S.W.2d 2, 4 (Tex.Crim.App.1985); *Medellin v. State*, 617 S.W.2d 229, 231 (Tex.Crim.App.1981).

Because no witness said they saw Cunningham shooting at the Cadillac, any criminal liability must result from his actions as a party. We believe the evidence, viewed in the light most favorable to the jury's verdict, is legally sufficient to support Cunningham's conviction on this basis.

The evidence is undisputed that Griffin and Battle had weapons that day, and that they fired those weapons at the Cadillac. It is also undisputed that Cunningham accompanied them to the park that day, and was in their company when the shooting started. Testimony established that Cunningham belonged to the same gang as Griffin and Battle, and that there was bad blood between his gang and the gang whose members were riding in the Cadillac. Lee and Darrell Bee said they saw Cunningham flee toward the back of the park with the others toward the creek. Darrell Bee also said that Cunningham had what appeared to be a gun in his hand as he fled with the group. It was this group which Officer Pytel was chasing toward the creek; he told his dispatcher that he was chasing five men, and "I believe all of them are armed."

Moreover, Officer Escobedo, Pytel's partner, heard shots and turned to see five to seven individuals, each with one arm extended in front of them. Escobedo said at least three of this group had handguns. This testimony suggests that Cunningham was at least acting in concert with the shooters; even if he was only pointing, and not shooting, his action suggests he was encouraging those who were shooting. Clinton Lee, Darrell Bee and William Bee each said they saw Cunningham with the acknowledged shooters; they each said they heard more than three different guns being fired. Darrell Bee also said he saw what appeared to be a gun in Cunningham's hand as he ran. Testimony also showed that when he fled, Cunningham fled with the group doing the shooting.

 Mere presence or even knowledge of an offense do not make one a party to the offense. *Oaks v. State*, 642 S.W.2d 174, 177 (Tex.Crim.App.1982). Moreover, one's acts committed after the offense is completed cannot make him a party to the offense. *Morrison v. State*, 608 S.W.2d 233, 235 (Tex.Crim.App.1980). However, acts committed after the offense may be considered by the court in deciding whether a defendant participated in a common scheme for purposes of party liability. *Beier*, 687 S.W.2d at 4; *Medellin*, 617 S.W.2d at 231. And flight, though not dispositive, can be considered by the trier of fact as an indication of guilt. *Alba v. State*, 905 S.W.2d 581, 586 (Tex.Crim.App.1995).

We believe Cunningham's membership in the Dope Overthrowing Gangsters, Pytel's posthumous testimony and Darrel Bee's testimony that Cunningham was armed as he fled the scene, and Escobedo's testimony that he saw five to seven men standing with arms outstretched, three of them with guns, was sufficient to establish that Cunningham at least encouraged commission of the aggravated assault on the Cadillac's occupants. A rational trier of fact could conclude from all this that Cunningham at the very least encouraged Griffin and Battle to commit aggravated assault. Cunningham's first point of error is overruled.

## FACTUAL SUFFICIENCY

In his second point of error Cunningham challenges the factual sufficiency of the evidence to support his conviction.

 This court has jurisdiction to examine the factual sufficiency of the evidence. *Clewis v. State,* 922 S.W.2d 126, 131–132 (Tex.Crim.App.1996). The factual sufficiency review process begins with the assumption that the evidence is legally sufficient under the *Jackson* standard. *Clewis,* 922 S.W.2d at 134 (citing *Stone v. State,* 823 S.W.2d 375 (Tex.App.—Austin 1992, pet. ref'd, untimely filed)). The appellate court then considers all of the evidence in the record related to appellant's sufficiency challenge, not just the evidence which supports the verdict. *Id.* The appellate court reviews the evidence weighed by the jury which tends to prove the existence of the fact in dispute, and compares it to the evidence which tends to disprove that fact. *Santellan v. State,* 939 S.W.2d 155, 164 (citing *Ellis County State Bank v. Keever,* 915 S.W.2d 478, 479 (Tex.1995) and *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 31 (Tex.1994)). The court is authorized to disagree with the jury's determination, even if probative evidence exists which supports the verdict. *Clewis,* 922 S.W.2d at 133; *see also In Re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

 However, factual sufficiency review must be appropriately deferential so as to avoid the appellate court's substituting its own judgment for that of the fact finder. *Clewis,* 922 S.W.2d at 133. The court's evaluation should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony. *Santellan,* 939 S.W.2d at 164 (citing *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 796 (1951); and *In Re Thoma,* 873 S.W.2d 477, 485 (Tex.Rev.Trib.1994)). We reverse only when the verdict is against the great weight of the evidence presented at trial so as to be clearly wrong and unjust, i.e., when the jury's finding is "manifestly unjust," "shocks the conscience," or "clearly demonstrates bias." *Clewis,* 922 S.W.2d at 135 (citing *Meraz v. State,* 785 S.W.2d 146, 149 (Tex.Crim.App.1990)). This standard grants the appropriate deference to the jury's verdict and prevents the reviewing court from substituting its judgment for that of the jury. *Santellan,* 939 S.W.2d at 164.

Using this standard, we cannot say that Cunningham's conviction as a party to the aggravated assault of the Bees, Lee and McIntyre was against the great weight of the evidence presented. Cunningham's second point of error is overruled.

## SAME TRANSACTION CONTEXTUAL EVIDENCE

 In his fourth point of error Cunningham argues the trial court erred in admitting the fact that Officer Paul Pytel drowned while in pursuit of the D.O.G. group. We disagree.

 It is well-settled that where one offense or transaction is one continuous episode or another offense or transaction is a part of the case on trial or blended or closely interwoven with it, proof of all the facts is proper. *Mitchell v. State,* 650 S.W.2d 801, 811 (Tex.Crim.App.1983). Such an extraneous offense is admissible to show the context in which the criminal act occurred; the reasoning is that such events do not occur in a vacuum. *Archer v. State,* 607 S.W.2d 539, 542 (Tex.Crim.App.[Panel Op.] 1980).

Here it was necessary to tell the jury of Officer Pytel's death to show the events of that day in their completeness. Pytel was the first peace officer on the scene of the charged offense and drowned while in pursuit of the wrongdoers. Prosecutors offered his testimony in the form of present sensory impressions relayed over the police radio. They were entitled to show why Officer Pytel himself was unavailable to testify. Appellant's fourth point of error is overruled.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Cunningham complains he was denied effective assistance of counsel. The test for ineffective assistance of counsel under the state and federal constitutions are the same, *Hernandez v. State,* 726 S.W.2d 53, 57 (Tex. Crim.App.1986), and so we consider them together.

The criteria for assessing ineffective assistance of counsel has been set forth by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The *Strickland* test focuses on reasonableness, measuring the assistance received against the prevailing norms of the legal profession. *Id.* at 690. Counsel is presumed to have rendered adequate assistance, and it is incumbent on the defendant to identify those acts or omissions which do not amount to reasonable professional judgment and are outside the "range of professionally competent assistance." *Id.* To show prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The constitutional right to counsel, whether appointed or retained, does not mean errorless counsel. *Castoreno v. State,* 932 S.W.2d 597, 604 (Tex.App.—San Antonio 1996, pet. ref'd) Whether the *Strickland* test has been met is to be judged by the totality of the representation, not isolated acts or omissions. *Rodriguez v. State,* 899 S.W.2d 658, 665 (Tex. Crim.App.1995).

The key question, then, becomes whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *See Castoreno,* 932 S.W.2d at 604, citing*Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

Cunningham complains of ineffective assistance under two different points of error. In his fifth point of error he argues that his counsel was ineffective because of a conflict between attorney and client; in his third he argues counsel was generally ineffective. We will take the specific allegation first.

### 1. Conflict between Attorney and Client

██ Before the jury was seated for the first day of trial, the following exchange was recorded for the record:

THE COURT: Is there anything you want to put on the record as far as plea agreements or anything else with your client or not?

MR. VAUGHN: No, sir.

THE COURT: Is this under the new law or is this—

MR. DIMALINE: It's an old one, Your Honor, third degree.

MR. VAUGHN: This is my client, Mr. Kenneth Cunningham, that I have brought in front of the bench. As I recall, I was approached outside the presence of Mr. Dimaline by a prosecutor who has been a prosecutor for several years, Mr. Springer. The Court knows Mr. Springer. And—who did approach me as to whether or not I would consider plea negotiations on behalf of Mr. Cunningham. I did tell Mr. Cunningham that a prosecutor was seeking to talk to me about a plea agreement. He instructed me not to discuss plea agreements with them. I have been an attorney for a long time, so I did not discuss it. Is that correct, Mr. Cunningham?

THE DEFENDANT: Yes, sir.

MR. VAUGHN: And last week, I guess, or two weeks ago, Mr. Dimaline I think may have wanted to discuss a plea agreement with you, too, but you didn't want to discuss any plea—

THE DEFENDANT: No.

MR. VAUGHN: —agreements with him also. So you have clearly instructed me not to negotiate a plea with any of the prosecutors?

THE DEFENDANT: Yes.

Cunningham argues the fact that his trial counsel felt he had to place this matter before the trial court shows a fatal conflict of interest between himself and his trial counsel; he urges that this conflict rendered his trial counsel ineffective. He further urges us to revisit the holding of *Monreal v. State,* 923 S.W.2d 61 (Tex.App.—San Antonio 1996), in which we found that the more stringent *Strickland* standard defining ineffective assistance applies to such attorney-client conflicts instead of the standard announced in *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). In sum, he urges us to overturn *Monreal*and use the standard announced for cases involving an attorney representing more than one defen-

dant in a given action. We decline his invitation, for two reasons.

First, the defendant in *Monreal* complained he was harmed not because his trial attorney revealed the existence of a plea bargain offer on the record, but because this attempted agreement was revealed *to the trier of fact* prior to the close of the guilt-innocence phase of trial. *Monreal,* 923 S.W.2d at 66 (with the trial court sitting as fact finder, "[t]he danger to the client, of course, is that the fact finder might be influenced by the fact that the client had sought a plea bargain"). Here the hearing in question was conducted outside the presence of the jury, which was sitting as the finder of fact in the instant case.

Second, even if we wanted to, we could not alter the balance struck in *Monreal.* Since this appeal was initiated, the Court of Criminal Appeals affirmed this court's determination that *Strickland* and not *Cuyler* control this question. *See Monreal v. State,* 947 S.W.2d 559 (Tex.Crim.App.1997).

Because the existence of attempted plea bargain negotiations was not revealed to the trier of fact, we find that Cunningham cannot show a reasonable probability that, but for the conflict revealed by this exchange, the result of the proceeding would have been different. Cunningham's third point of error is overruled.

### 2. Ineffective Assistance—In General

Cunningham argues his counsel failed to adequately conduct voir dire, that he failed to obtain a proper instruction on the law of parties, that he failed to preserve error on admission of Officer Pytel's death, that he failed to object to injection of gang affiliation into the guilt-innocence phase of the trial, and that he failed to object to admission of extraneous offenses at the guilt-innocence phase. We take each of these contentions in turn.

■ We note first that we found the matter of Pytel's death to be admissible as res gestae of the offense charged. Since the matter was admissible, failure to object to that matter could not have prejudiced Cunningham. Therefore this contention is without merit. Similarly, the testimony of Lucas "Buster" Dukes was admissible under the same theory; therefore failure to object could not constitute an instance of ineffective assistance of counsel.

■ Similarly, we find that trial counsel was not ineffective for not objecting to evidence of Cunningham's gang affiliation. Such evidence is admissible to show motive. TEX. RULE EVID. 404(b). Here gang affiliation was used to show a motive for the shooting; additionally four of the key witnesses against Cunningham were also shown to be gang members.

■ Cunningham argues his trial counsel was ineffective in conducting voir dire because he failed to ask individual questions of jurors. His specific complaint is that four members of the jury panel who, in response to his counsel's question, said they would give more credence to a police officer's testimony than a gang member's testimony were allowed to serve on the jury panel. After asking that question, Cunningham's counsel did not follow up with individual questions.

When considering prejudice to appellant resulting from voir dire, the standard is whether the individual jurors identified would be challengeable for cause based on the statements complained of in the record. *McFarland v. State,* 928 S.W.2d 482, 503 (Tex.Crim.App.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 966, 136 L.Ed.2d 851 (1997), *overruled on other grounds by Mosley v. State,* 983 S.W.2d 249 (Tex.Crim.App. July 1, 1998). All four of the jurors complained of by Cunningham were asked by the state individually if they could be fair and impartial; all four said they could. These jurors therefore did not rise to the level of being challengeable for cause. *See* TEX.CODE CRIM. PROC. ANN. art. 35.16 (Vernon 1989 & Supp. 1998). We therefore find that Cunningham has not shown that his counsel's performance at voir dire was ineffective.

■ Cunningham also complains that his trial counsel was ineffective in failing to get a jury instruction on the law of parties in the charge. On trial counsel's request, Cunningham was entitled to a more specific instruc-

tion than that given; however, it was his burden to request the instruction or object to the charge. *Chatman v. State*, 846 S.W.2d 329, 332 (Tex.Crim.App.1993). Our record is silent as to why he did not request the language contained in TEX. PENAL CODE ANN. § 7.02(a). However, Cunningham's trial counsel did request clarification of the party language, which was granted, and requested a limiting instruction on extraneous offenses which was also inserted in the charge. Looking at the totality of the representation in the charge conference, we cannot say that trial counsel was ineffective under the *Strickland* standard at this point of the trial.

■ Finally, Cunningham charges his counsel was ineffective in failing to object to extraneous bad act testimony—such as Lee's testimony that Cunningham had shot at him before the instant incident, and Kenneth Johnson's testimony that he had seen Cunningham with a weapon before this offense. However, a defendant is not entitled to errorless counsel. Looking at the totality of the representation, we cannot say that trial counsel's actions so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *See Castoreno*, 932 S.W.2d at 604.

Cunningham's third point of error is overruled. The judgment of the trial court is in all things affirmed.

Dissenting opinion by DUNCAN, J.

DUNCAN, Justice, dissenting.

As a reviewing court, we owe a responsibility to the jury to indulge all reasonable inferences in favor of its verdict. But we also owe a responsibility to criminal defendants to ensure that convictions are based upon evidence that is legally sufficient under the United States Constitution. Kenneth Cunningham was convicted on less evidence than our Constitution requires. I would therefore reverse the trial court's judgment and render a judgment of acquittal.

FACTUAL AND PROCEDURAL BACKGROUND

One Sunday evening in late July 1994, Cunningham, a member of a gang called the Dope Overthrowing Gangsters, was standing inside the entrance to Martin Luther King Park with or near Frederick Burkes and Cunningham's fellow gang members Daniel Griffin, Terry Battle, and Frederick Carter. Suddenly, several of the men opened fire on a green Cadillac Fleetwood stopped at a stop light in front of the park. Inside the Cadillac were rival gang members Darrell and William Bee and Clinton Lee, as well as Lee's uncle and the driver of the car, Delvage McIntyre.

Park Ranger Gabriel Escobedo, Jr. heard the shots, turned in their direction, and saw five to seven young black males. Although Escobedo testified he "believed" all of the men had their right arms extended, he further testified he was able to see only three guns. Lee saw Cunningham run with the shooters and Burkes towards the creek in the back of the park, and Darrell Bee saw what looked to him like a gun in Cunningham's hand after the shooting when he was running away. Escobedo also saw the five or six black males run towards the back of the park. By that point, however, everyone in the park—and there were hundreds or even thousands—was running for cover.

After a chase that, tragically, resulted in the death of Park Ranger Paul Pytel, Police Officer Carlos Trevino apprehended Burkes and Battle, who surrendered an empty .9 millimeter semi-automatic pistol. Later, Griffin's body was found in the bottom of the creek. A few feet away, a double action Ruger automatic handgun was found. The Ruger was loaded with one round in the chamber and a magazine containing fourteen rounds. An empty clip was found in Griffin's pocket. Forensic testing established the gun found near Griffin's body fired the twenty spent shell casings found at the scene of the shooting.

The Bees and Lee saw Cunningham standing with the shooters at the time of the shooting, but they did not identify him or Burkes the night of the shooting or name him in their written statements. Cunningham was not mentioned, in fact, until several days later, when Officer Rene Martinez showed all four occupants of the Cadillac a

single picture of Griffin and two photo arrays, one of which included pictures of Carter and .Cunningham and the other of which included a picture of Cunningham. All four occupants of the Cadillac identified Griffin, Carter, and Cunningham as being "involved in the aggravated assault and the shooting itself." The State charged Cunningham with four counts of aggravated assault with a deadly weapon by "knowingly and intentionally threaten[ing] bodily injury ... by aiming and shooting [a firearm] at and in the direction" of the four occupants of the Cadillac.

A few days before trial, the two prosecutors involved in the case met with Lee. At that meeting, Lee apparently said Cunningham "shot at" him; he was then reminded by the two prosecutors that he had not included this fact in his earlier statement. At trial, Lee would identify only Griffin, Battle, and Carter as shooters. The State then began to treat Lee as an adverse witness, questioning him about his oral statement a few days earlier. Lee explained this statement was based upon his assumption that Cunningham would also have been shooting because he was with his fellow gang members and he would not have wanted to look like a "punk." In short, despite extensive questioning by the State, Lee insisted at trial he saw only three shooters—Griffin, Battle, and Carter. William and Darrell Bee also insisted they saw only the three shooters identified by Lee; however, the Bees testified they believed there must have been more because there were so many shots. McIntyre did not see Cunningham and identified the shooters as only Griffin and Battle. Like the Bees, however, he believed there must have been more than two shooters.

The jury also heard an audio recording of the exchange between Pytel, in pursuit, the dispatcher, and later Escobedo. In this exchange, Pytel initially said he was chasing "about six black males," and he described one. Seconds later, Pytel said "there may be five of them" or "there may be as many as five of them," and he "believe[d] all of them [were] armed."

The court's charge instructed the jury that it could find Cunningham guilty of the charged offenses under the law of parties.

During its deliberations, the jury asked for a tape recorder to listen again to the tape recording of Pytel's conversation with the dispatcher, and this request was granted. The jury also asked to hear again "Darrell Bee's testimony regarding when he thought he saw a gun," and this request was granted. Approximately two hours later, the jury found Cunningham guilty on all counts. Cunningham was thereafter sentenced by the trial court to ten years on each count, with the sentences to run concurrently.

## STANDARD OF REVIEW

To determine whether the evidence is legally sufficient to support a criminal conviction, we review the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

## DISCUSSION

Cunningham was charged with aggravated assault by knowingly and intentionally threatening imminent bodily injury to the occupants of the Cadillac by aiming and shooting a gun at and in their direction. *See* TEX. PENAL CODE ANN. §§ 22.01(a)(2), 22.02(a)(2) (Vernon 1994). However, there is no direct or circumstantial evidence Cunningham aimed or fired a gun during the commission of the offense and no evidence from which this fact can rationally be inferred. Therefore, the conviction cannot be sustained on the theory Cunningham acted as a principal actor in the commission of the offense. However, the court's charge also authorized conviction under the law of parties. *See id.* §§ 7.01, 7.02(a)(2). We must therefore determine whether there is legally sufficient evidence to support the jury's finding of guilt under this theory.

Under the law of parties, a person may be convicted of the offense if he "is physically present at the commission of the offense, and encourages the commission of the offense either by words or other agreement." *Burdine v. State,* 719 S.W.2d 309, 315 (Tex.Crim. App.1986), *cert. denied,* 480 U.S. 940, 107

S.Ct. 1590, 94 L.Ed.2d 779 (1987). "The evidence must show that at the time of the offense the parties were acting together, each contributing some part towards the execution of their common purpose." *Id.* In determining whether a defendant participated in an offense as a party, the court may examine the events occurring before, during, and after the commission of the offense and may rely on the defendant's actions that show his understanding and common design to commit the offense. *Beier v. State,* 687 S.W.2d 2, 4 (Tex.Crim.App.1985). However, acts committed after the offense do not establish liability as a party. *Morrison v. State,* 608 S.W.2d 233, 235 (Tex.Crim.App. [Panel Op.] 1980); *see Urtado v. State,* 605 S.W.2d 907, 912 (Tex.Crim.App. [Panel Op.] 1980); *Pesina v. State,* 949 S.W.2d 374, 382–85 (Tex.App.—San Antonio 1997, no pet.); *Guillory v. State,* 877 S.W.2d 71, 74 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd).

There is no question Cunningham was present during the commission of the offense and standing with or near the three identified shooters. But there is no direct evidence Cunningham was involved with the shooters in a common design; no direct evidence he in any way encouraged or assisted in the commission of the offense; and no direct evidence he intended to do so. Accordingly, we can sustain Cunningham's conviction only if a rational juror could infer his guilt (he encouraged the commission of the aggravated assault) from the circumstantial evidence, and this inference established his guilt beyond a reasonable doubt. It is at the second of these two junctures that the majority and I disagree.

For analytical purposes, I will concede the majority's holding: a rational juror could infer that "Cunningham at least encouraged commission of the aggravated assault" from: (1) "Cunningham's membership in the Dope Overthrowing Gansters"; (2) "Pytel's posthumous testimony," *i.e.,* he saw five or six black males, all of whom he "believed" were armed, running towards the back of the creek (3) "Darrell Bee's testimony that Cunningham was armed as he fled the scene"; and (4) "Escobedo's testimony that he saw five to seven men standing with arms outstretched, three of them with guns." But I strongly disagree that this "inference," which I frankly believe is nothing more than speculation, constitutes sufficient evidence to convince a rational person *beyond a reasonable doubt* that Cunningham encouraged the commission of the aggravated assault on the occupants of the Cadillac. At best, this "inference" is "some evidence" to support the jury's finding of guilt. But it cannot " 'seriously be argued that such a 'modicum' of evidence could by itself rationally support a conviction beyond a reasonable doubt.' " *Amunson v. State,* 928 S.W.2d 601, 611 (Tex. App.—San Antonio 1996, pet. ref'd) (Duncan, J., dissenting) (quoting *Jackson v. Virginia,* 443 U.S. 307, 320, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

CONCLUSION

The majority's holding encompasses the first aspect of the *Jackson* standard of review—there is some evidence from which a rational juror could infer that Cunningham encouraged the commission of the aggravated assault. But the majority fails to even reach the second aspect of the *Jackson* standard—whether this evidence is sufficient to justify a rational conclusion of guilt beyond a reasonable doubt. I would hold the inference is legally insufficient to support Cunningham's conviction beyond a reasonable doubt and therefore reverse the trial court's judgment and render a judgment of acquittal.