

NUMBER 13-08-00120-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**JOSE MIGUEL VASQUEZ,**                                                                 **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                 **Appellee.**

**On appeal from the 36th District Court of San Patricio County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides
Memorandum Opinion by Justice Benavides**

Appellant, Jose Miguel Vasquez, was tried by a jury and found guilty of aggravated assault with a deadly weapon and deadly conduct, both committed while engaging in organized criminal activity. *See* TEX. PENAL CODE ANN. §§ 22.02(a)(2) (Vernon Supp. 2008), 22.05(b)(2) (Vernon 2003), 71.02(a)(1) (Vernon Supp. 2008). The trial court assessed twenty years' imprisonment for the aggravated assault and twenty years for the deadly conduct, with the sentences to run concurrently; court costs; and attorney's fees.

By three issues, Vasquez argues that the evidence is insufficient to support the convictions. We affirm.

## I. BACKGROUND

### A. Sonja Nix's Testimony

In May 2007, Sonja Nix was employed at the Pizza Hut in Rockport, Texas. She was dating Charles Hinkle and had a seven-year-old daughter named Kamri Nix. On May 30, 2007, Sonja worked the closing shift, and from there, she drove to the Patio Bar to meet with Charles and some friends. Charles and Sonja left the bar at 2:00 a.m. on May 31, 2007, took a friend home, and then drove to pick up Sonja's mother's car. After picking up the car, the two drove separately to pick up Kamri at Sonja's home, which she shared with her mother and grandmother. The couple, along with Kamri, intended to sleep at Charles's house.

Sonja lived on Matlock Street. As Sonja drove down Matlock Street towards the trailer park she lived in, she noticed a party or a gathering outside of Vasquez's house . Sonja testified that there were five or six people in the yard. Sonja stated that she was driving fifteen to twenty miles per hour because the road was in bad condition. When she passed by the house, Sonja did not see Vasquez.

Sonja and Charles went to her house and parked the cars. Sonja went inside to get her daughter and some clothes for the next day. Sonja, Charles, and Kamri then left the house in Charles's car, which was a gray Mustang. Charles drove while Sonja sat in the front passenger seat, and Kamri laid down in the back seat. They traveled back down Matlock Street heading towards Charles's house.

Sonja testified that as they passed by Vasquez's house this time, she noticed Vasquez and one other person standing on the curb. When they passed Vasquez on the

2

road, Sonja said that she turned to her left to speak to Charles and saw that Vasquez was standing about a foot away from the driver's side car window and had a gun up to the window of the car. She stated that she did not get a good look at the gun, but she noticed that there was a silver lining on the inside of the barrel. She testified that while this was happening, Charles was looking straight ahead and listening to her talk. Sonja testified that she did not say anything to Charles at the time because she was afraid and in shock. Just after they passed the house, Sonja said she felt a pain in her shoulder. She then told Charles that she thought she had been shot. After that, she heard beer bottles being thrown at the car and heard gunshots being fired. Sonja testified that she heard three or four shots.

Charles drove a few blocks and then stopped to look at Sonja's shoulder, immediately realizing she had in fact been shot. Charles drove Sonja to the hospital, where she received treatment for her gunshot wound. The shot fractured her scapula and two ribs and also collapsed one of her lungs by twenty percent. That night, Sonja spoke to the police but only long enough to tell them her name and where she had been shot. She remained hospitalized for two weeks.

## B.    Charles Hinkle's Testimony

Charles confirmed Sonja's testimony as to their trip from the bar to Sonja's house. Charles testified that after leaving Sonja's house, as they passed Vasquez's house, he saw people in the yard, two of whom were closer to the street. After passing the residence, Sonja told Charles that she had a pain in her shoulder and that she had been shot. He told Sonja that was not possible because he did not hear any gunshots and because no windows were broken. After that, however, he heard bottles breaking and gunshots and saw Sonja's shoulder was injured.

3

On cross-examination, Charles testified that he believed that the two people on the street at Vasquez's house were on opposite sides of the street and that they were "kind of like crouched down to look in the windows while we drove by." But he admitted that he did not recall them approaching the vehicle.

## C. Officer Kyle Rhodes

Officer Kyle Rhodes, a patrol sergeant with the Aransas Pass Police Department, testified that at 3:00 a.m., he received a call from dispatch about multiple shots fired in the area of Vasquez's house. He went to Matlock Street and assisted other officers in forming a perimeter to prevent cars from entering or leaving the area. He testified that one car was stopped attempting to leave the area. Officer Rhodes could not read the car's license plate because it was "darked out. It didn't have its lights on."

Officer Rhodes testified that the car was a silver Intrepid that was leaving Vasquez's house. He stated that the car was attempting to drive eastward on Matlock, away from the residence, but it was stopped upon Officer Rhodes's request by a San Patricio deputy, Deputy Grumbles. Officer Rhodes then approached the stopped car, and Vasquez was identified as the driver. No weapons were found on Vasquez at the time. Officer Rhodes placed Vasquez in the back of his patrol unit, and that was the extent of his participation that night.

## D. Officer Adrian Rodriguez

Officer Adrian Rodriguez is an investigator with the San Patricio County Sheriff's Department. He testified that he assisted the Aransas Pass Police Department in collecting evidence at Vasquez's residence. Officer Rodriguez identified fired shell casings found at the scene.

On the street in front of Vasquez's house, Officer Rodriguez found several spent

4

shell casings. First, he found a "Winchester 380 Auto" spent shell casing. Second, he found two "RP-380 Auto" spent shell casings. Third, he found two "Winchester 7.62x39" spent shell casings. He also found broken beer bottles on the street and in the yard. In the yard, Officer Rodriguez found a "Fioche USA nine millimeter Rueger [sic]" and an "R-P 380 Auto" spent shells. He testified that there were some shell casings near the patio.

Officer Rodriguez explained that in the neighbor's yard, the officers found a black rifle and two pistols wrapped in towels and hidden behind the front tire of a car. The rifle was an SKS semi-automatic rifle, and it had a magazine filled with several unfired rounds. One pistol was a chrome, semi-automatic pistol with a magazine containing two unfired rounds. The second pistol was a black, semi-automatic pistol with a magazine containing three rounds. No fingerprints were recovered on any of the weapons.

Officer Rodriguez testified that a pistol would fire a 380 caliber bullet. Both a rifle and a pistol could fire a 9 millimeter bullet, and a 7.62x39 bullet would be fired from a rifle. Officer Rodriguez testified that the rifle found at Vasquez's house would fire the 7.62x39 caliber bullets found at the scene.

On cross-examination, defense counsel asked Officer Rodriguez if he noticed whether the barrel of the rifle had a silver lining, and he responded that he did not notice. On re-direct, however, Officer Rodriguez testified that the chrome pistol's barrel could be described as "silver."

### E.    Detective Gus Perez

Detective Guz Perez testified that he is a detective sergeant for the Aransas Pass Police Department. He testified that he was the detective on duty at 3:00 a.m. on May 31 and received a call to proceed to Matlock where a shooting had occurred. Detective Perez stated that when he arrived in the area, Vasquez had already been stopped by the officers

5

and detained.

After obtaining consent to search the residence, Detective Perez assisted with the search. Detective Perez testified that in Vasquez's bedroom, he located (1) an unfired 380 caliber round of ammunition; (2) two unfired 9-millimeter rounds of ammunition; and (3) an unfired 7.62x39 millimeter round of ammunition. He explained that a 7.62x39 millimeter bullet would be fired by an assault rifle, while a 380 caliber bullet would be fired by a .38 caliber handgun. The officers also found a pistol hidden under a mattress in Vasquez's brother's room.

Detective Perez stated that because the officers had found ammunition for a 7.62x39 millimeter weapon and 380 casings in the street, the officers did not "give up" searching for weapons—"we knew that there was [sic] at least two other weapons that were still missing." He testified that, thereafter, the officers found an SKS assault rifle, a Bryco 380 caliber pistol, and a Highpoint 380 caliber pistol under a car parked on an adjoining property.

The evidence was submitted to the Department of Public Safety crime lab for analysis. An analyst determined that (1) the firearms submitted were functional; (2) three of the five 380 caliber cartridge cases found in the middle of the street were fired by the Highpoint Model CF-380 pistol; (3) one of the five 380 auto caliber cartridges was fired by the Bryco Model .38 pistol; and (4) two 7.62x39 caliber cartridge cases found in the street were fired by the SKS rifle.

On cross-examination, Detective Perez testified that the Highpoint 380 pistol was a solid-black pistol, and three rounds fired from this gun were found in the street, while the round fired from the chrome pistol was found in the yard. He admitted that because there is only one bullet hole in the car, there is really no way to tell if any other shots were

6

actually fired at the car.

Detective Perez testified that he believed that the bullet fired into Charles's car was fired by the SKS rifle. He agreed that, based on the level of penetration, the fact that the bullet traveled through the back of the car before hitting Sonja, and the diameter of the entry hole, the bullet must have come from a high powered rifle instead of a 380 handgun. Detective Perez indicated that Joshua Wellesley, one of the individuals at Vasquez's residence that night, was charged based on eyewitness testimony from Vasquez's brother, with firing the SKS rifle. Additionally, Wellesley tested positive for gunshot residue immediately after the shooting. No gunshot residue test was performed on Vasquez, however, because the police department ran out of kits.

Detective Perez testified that after completing the search, he returned to the police department, where he interviewed Vasquez. He stated that after informing Vasquez of his rights, Vasquez refused to provide a written statement but agreed to give an oral statement, which Detective Perez videotaped. The video was played for the jury, but a transcript of the videotape does not appear in the record.

Detective Perez testified, however, that Vasquez told the police that he had shot a nine-millimeter pistol up into the air earlier in the night but that he did not have anything to do with the shooting incident. There were no 9 millimeter shell casings found in the street. Vasquez admitted that the SKS assault rifle was his and also that the chrome 380 pistol was his. He told the police, however, that he was inside the residence and did not know what happened outside.

## J.    Dixiana Lopez's Testimony

Dixiana Lopez testified that she has known Vasquez for several years and that she was present at his house on May 31. She said that about ten people were present, and

7

they were outside on the porch of Vasquez's house drinking beer. Wellesley was not there at first but arrived later.

Lopez testified that she saw a gray Mustang pass by the house. She did not recall if anyone discussed the gray Mustang. At some point, she went inside the house. Lopez claimed that she did not hear any shots fired because she was inside with Vasquez and his brother. Although she did not hear the shots fired, she claimed that everyone inside ran outside to see what was going on, and she followed. When she went outside, she said that she saw a Mustang on the road and then the police.

Lopez claimed that she did not see Vasquez in possession of any guns that night, but she did see a gun that she believed belonged to Wellesley. She testified that she did not see anyone fire a gun that night.

## K.    Daniel Flores, Jr.'s Testimony

Daniel Flores, Jr. testified that he is a close friend to Vasquez. He was present at Vasquez's home on May 31. Flores testified that he was inside the residence that night at the time of the shooting. He testified that he heard gunshots and then went outside, but he could not remember how many gunshots he heard. Flores believed that Lopez was also inside the residence, along with Vasquez's brother, but he could not remember who else was inside. Flores testified that he did not see anyone in possession of a firearm that night. Once Flores went outside, Vasquez told him that he wanted to leave, and Flores then left with Vasquez. The police pulled the two men over in the car.

## II. Aggravated Assault With a Deadly Weapon

By his first issue, Vasquez argues that the evidence is factually insufficient to support his conviction for aggravated assault while engaging in organized criminal activity.

## A.    Standard of Review and Applicable Law

8

"In a factual sufficiency review, we view all the evidence in a neutral light, both for and against the finding, and set aside the verdict if 'proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof.'" *Vodochodsky v. State*, 158 S.W.3d 502, 510 (Tex. Crim. App. 2005) (quoting *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000)). We must consider all of the evidence weighed by the jury, "comparing the evidence which tends to prove the existence of the elemental fact in dispute to the evidence which tends to disprove it." *Id.* While we are authorized to disagree with the jury's determination even if there is evidence to support the verdict, we must nevertheless avoid substituting our judgment for that of the fact-finder. *Id.*

Factual sufficiency of the evidence must be measured in terms of the "elements of the offense as defined by the hypothetically correct jury charge for the case." *See Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000); *Malik v. State*, 953 S.W.2d 234, 239-40 (Tex. Crim. App. 1997). "Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240. Review of the sufficiency of the evidence under a hypothetically correct jury charge includes consideration of the law of parties. *Garza Vega v. State*, 267 S.W.3d 912, 915-16 (Tex. Crim. App. 2008).

Section 22.01 of the penal code provides that a person commits the offense of assault if he "intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse. . . . " TEX. PENAL CODE ANN. § 22.01(a)(1) (Vernon Supp. 2008). The assault is aggravated if the person "uses or exhibits a deadly weapon during

9

the commission of an assault." TEX. PENAL CODE ANN. § 22.02(a)(2). In order to convict Vasquez of aggravated assault under the law of parties, the State was required to prove that, with the intent to promote or assist an aggravated assault, he solicited, encouraged, directed, aided, or attempted to aid in the commission of the aggravated assault. TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 2003); *see Hooper v. State*, 214 S.W.3d 9, 14 n.3 (Tex. Crim. App. 2007). Sufficient evidence under the law of parties exists where the actor is physically present at the commission of the offense, and encourages the commission of the offense either by words or other agreement. *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985); *Tarpley v. State*, 565 S.W.2d 525, 529 (Tex. Crim. App. 1978). The evidence must show that at the time of the offense, the parties were acting together, each contributing some part towards the execution of their common purpose. *Brooks v. State*, 580 S.W.2d 825, 831 (Tex. Crim. App. 1979). In determining whether a defendant is a party to an offense, the court may look to events before, during, and after the offense, and can rely on actions showing an understanding and common design to commit the offense. *Burdine v. State*, 719 S.W.2d 309, 315 (Tex. Crim. App. 1986).

**B.     Discussion**

It is undisputed that Wellesley fired a weapon at a vehicle in which the victim, Sonja Nix, was riding. Vasquez was convicted as a party to the offense. *See* TEX. PENAL CODE ANN. § 7.02(a)(2). Vasquez argues that the evidence is factually insufficient to convict him as a party to the offense because (1) the evidence showed he was not present at the time of the offense; and (2) the victim's testimony that Vasquez was present and displayed a weapon himself was not corroborated by the other passenger in the car or by the physical evidence. We disagree.

First, Vasquez argues that the testimony demonstrated that he was inside the

10

residence and did not know what occurred outside. It is true that Lopez testified that Vasquez was inside the residence at the time of the offense and that Vasquez also told the police that he was inside the residence. However, Sonja expressly testified that she saw Vasquez outside and that he pointed a gun with a silver-colored barrel at Charles's car.

Vasquez argues that Sonja's testimony (1) is inconsistent with the ballistics evidence, which showed that the shell casings found in the street were fired from a solid black 380 caliber pistol, and (2) is not supported by Charles's testimony that he did not see anyone approach the car. We disagree.

First, the fact that no ammunition was found in the street matching the chrome pistol described by Sonja is completely irrelevant. Vasquez was convicted under the law of parties; thus, as a party, it was not necessary for Vasquez to have actually fired the gun. As a party, he is liable for Wellesley's conduct in firing the SKS assault rifle. *See* TEX. PENAL CODE ANN. § 7.02(a)(2); *Rodriguez v. State*, 646 S.W.2d 671, 672-73 (Tex. App.–Dallas 1983, no pet.); *see also Cervantes v. State*, No. 14-05-00203-CR, 2006 WL 1459576, at *1 (Tex. App.–Houston [14 Dist.] May 25, 2006, pet. ref'd) (mem. op., not designated for publication).

Second, Charles's testimony is not inconsistent with Sonja's testimony. In fact, Charles testified that he saw two individuals crouched down on the side of the street as he and Sonja passed by Vasquez's house. Charles said he did not see anyone approach the car, but this testimony was explained by Charles's other testimony that he was looking straight ahead while listening to Sonja. Finally, although Lopez and Vasquez claimed he was inside the residence at the time, the jury was entitled to credit Sonja's testimony and discount Vasquez's alibi evidence. *See Johnson*, 23 S.W.3d at 7 (holding that factual sufficiency review should not intrude on jury's responsibility to weigh the credibility of the

11

witnesses).

Nevertheless, Vasquez argues that there is no evidence that he and Wellesley were working towards some common purpose in the shooting. We disagree. Detective Perez testified that Vasquez admitted that he owned the chrome pistol and the SKS assault rifle, which Wellesley used to shoot Sonja. The evidence showed that both Vasquez and Wellesley were present in the street and that both possessed firearms. Charles testified that the two men were crouched down, and from this, the jury could have inferred that the men were attempting to conceal their location. Additionally, after the incident, Vasquez attempted to leave the scene in a car, driving with his lights off. The jury could have inferred that Vasquez was trying not to be detected as he fled from the scene. We may look to Vasquez's actions, in displaying the chrome pistol and in attempting to secretly leave the scene, and the fact that he owned the SKS assault rifle used by Wellesley, as evidence of a common purpose. *See Cunningham v. State*, 982 S.W.2d 513, 520 (Tex. App.–San Antonio 1998, no pet.). Accordingly, the evidence was not factually insufficient to support Vasquez's conviction as a party to the offense, and we overrule Vasquez's first issue.

### III. Deadly Conduct While Engaging in Organized Criminal Activity

By his third issue, Vasquez argues that the evidence is legally insufficient to sustain his conviction for deadly conduct because there is no evidence that he discharged a firearm at or in the direction of the vehicle. By his second issue, he challenges the factual sufficiency of the evidence for the same basic reason. The jury was authorized under the indictment, the evidence, and the jury charge to convict Vasquez under the law of parties; thus, as we noted above, it is irrelevant that Vasquez did not actually fire the gun himself because his conviction rests on his assistance to Wellesley in committing the offense.

12

Vasquez does not explain why his conviction for deadly conduct was improper by addressing the evidence under the law of parties. Accordingly, he has not provided this Court with a valid ground to reverse the conviction, and we overrule his second and third issues. *See Vega v. State*, 267 S.W.3d 912, 915 (Tex. Crim. App. 2008) (holding that conviction must be upheld if supported by any theory of liability); *see also Cervantes*, 2006 WL 1459576, at *1.

## IV. Conclusion

The trial court's judgment is affirmed.

_____
GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Memorandum Opinion delivered and
filed this the 31st day of August, 2009.