**Jason Dewayne NICHOLSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–04–392 CR.**

Court of Appeals of Texas, Beaumont.

Submitted March 25, 2005.

Decided April 20, 2005.

Dean Watts, Nacogdoches, for appellant.

Clyde M. Herrington, Dist. Atty., James M. Yakovsky, Asst. Dist. Atty., Lufkin, for state.

Before McKEITHEN, C.J., KREGER and HORTON, JJ.

## OPINION

STEVE McKEITHEN, Chief Justice.

On August 5, 2004, appellant, Jason Dewayne Nicholson, waived his right to a jury and proceeded to trial on charges contained in two separate indictments. In Cause Number 24,532, appellant was charged with having committed Aggravated Assault of a Public Servant[1] on or about March 17, 2004, by shooting at Fred Shewmake, a peace officer who was attempting to detain or arrest appellant. In Cause Number 24,535, the indictment contained two counts. In the first count, appellant was again charged with Aggravated Assault of a Public Servant on or about March 17, 2004, by shooting at Brad Prince, a peace officer who was attempting to detain or arrest appellant. In the second count, appellant was charged with Attempted Capital Murder on or about March 17, 2004, by discharging a firearm in the direction of Mike Wilson, with the specific intent to commit the offense of capital murder, with said act amounting to more than mere preparation that tended but failed to affect the commission of the offense intended.[2] At the conclusion of the trial, the trial court found appellant guilty on all three charges. The trial was recessed for preparation of a pre-sentence investigation report (PSI) with the trial court ultimately sentencing appellant to confinement in the Texas Department of Criminal Justice—Correctional Institutions Division for life on all three charges. Appellant has not appealed his conviction in Trial Cause Number 24,532. The instant appeal from the conviction in Trial Cause Number 24,535, raises the issues of lack of both legally and factually sufficient evidence to sustain the convictions on each count alleged. Finding no error occurred in the court below, we affirm.

The facts surrounding the shootings in question are not contested. The record indicates that shortly after 4:00 p.m. on March 17, 2004, Fred Shewmake, a Texas game warden and certified peace officer, pulled over a vehicle matching the de-

1. See Tex. Pen.Code Ann. § 22.02(a)(2), (b)(2) (Vernon Supp.2005).

2. See Tex. Pen.Code Ann. § 15.01(a) (Vernon 2003); Tex. Pen.Code Ann. § 19.03(a)(1) (Vernon Supp.2005).

scription of one involved in an aggravated robbery earlier that day. The vehicle initially appeared to contain one person, the driver, but when the vehicle stopped, two additional individuals raised up, causing them to come into view. The driver was later identified as a male named Hooper. Through the combined testimony of Game Warden Shewmake, the two other complainants (Trooper Brad Prince and Deputy Mike Wilson), Sergeant Dawn Stripling of the Angelina County Sheriff's Office, and Texas Ranger Sergeant Pete Maskunas, the front-seat passenger was identified as appellant, and the back-seat passenger identified as Carl Austin. Shewmake testified that when the suspects' vehicle stopped, Austin and appellant jumped out almost simultaneously. Within a matter of seconds, the front-seat passenger (appellant) pointed a handgun directly at Shewmake's face and fired a shot. Shewmake immediately returned fire. At some point during the shooting, the driver, Hooper, got out of the vehicle and dropped to the ground where he remained until Shewmake was able to handcuff him. Shewmake placed Hooper in Shewmake's Parks and Wildlife truck.

At trial, Shewmake was positive that appellant was not the driver of the suspect-vehicle as Shewmake had spent time with the driver at the scene of the initial shooting. Shewmake further testified that appellant could not have been the rear-seat passenger because his memory of the rear-seat passenger was of a man who was "kind of long and lanky," while the front-seat passenger was "short and just average build." Shewmake considered his (Shewmake's) height, 5'11", as being similar to that of the rear-seat passenger who Shewmake thought was close to six feet tall. By contrast, Shewmake noted that the front-seat passenger was "quite a bit shorter than me." Although unable to state "beyond a reasonable doubt" that appellant was the front-seat passenger/shooter, Shewmake justified his belief that appellant was the assailant through "the process of elimination."

An additional pertinent fact from Shewmake's testimony indicated that the handgun used in the shooting appeared to be a semi-automatic pistol and dark in color. He further described the taller, rear-seat passenger's clothing to have consisted of a red, sleeveless jersey with a white T-shirt underneath, and black shorts. The front-seat passenger, who shot at Shewmake, was wearing pants that were either blue jean or denim-type pants, or a cotton blend, and wore either a short-sleeve shirt or no shirt at all. Shewmake added that he was approximately twenty-five feet from the front-seat passenger when the man fired the shot, and that he (Shewmake) had no problem seeing the events as they all happened around 4:30 in the afternoon, on a clear day with plenty of daylight. Also, Shewmake was in full-uniform and wearing his badge, name-tag, and gun-belt. After the exchange of gunfire, both passengers ran up a hill and eventually into a nearby wooded area.

 It was during the subsequent manhunt for appellant and Carl Austin that the complainants (Prince and Wilson) in the instant appeal were fired upon. Both instances took place after dark and neither complainant could positively say it was appellant who fired the shots at them. The record indicates that while it was still dark, appellant surrendered to law enforcement as they closed in on his position, but Carl Austin continued hiding from the authorities until after daybreak on March 18. Two days later, the authorities discovered a nine millimeter semi-automatic handgun in the wooded area very close to where appellant surrendered. Without ob-

jection,[3] Sergeant Pete Maskunas of the Texas Rangers, one of two men "in charge of the scene," summarized a portion of his involvement and investigation as follows:

Q. [State] Okay. And did you see any of the suspects taken into custody? Were you present when any of those individuals were brought in?

A. [Maskunas] I was—I was in the area, but, no, I was not present to see the actual subject being taken into custody, except for later on in the day when I actually took one into custody myself.

Q. Okay.

A. Not this individual.

Q. So, you took another individual into custody?

A. Yes, sir.

Q. Okay. Did you have information as to who the first suspect was, or who was taken into custody?

A. Yes, sir, I did. I had contact with the officers that took him into custody.

Q. Okay. And they were able to tell you who that individual was?

A. Yes, sir, they were.

Q. And who was that?

A. That was Jason Nicholson.

Q. Okay.

A. And he is sitting here in the courtroom.

Q. Okay. And you said you took the third suspect into custody yourself?

A. Yes, sir. With the assistance of the SWAT team.

Q. Okay. About what time was that?

. . . .

Q. Okay. Can you describe what that individual looked like, what he was wearing, height, or anything like that?

A. He was—I believe he was wearing a pair of tennis shoes and a pair of shorts, and I'm not sure if he was wearing a shirt or not.

Q. Okay.

A. I can't recall exactly.

Q. Okay. Did he have a weapon on him?

A. No, he did not.

Q. Okay. And did you all locate a weapon in his vicinity?

A. No, sir, we did not.

. . . .

Q. Ranger Maskunas, did you have any other—did you fulfil any other role as far as investigating this? Once—once the suspects had been taken into custody that night you were out on the scene, what did you do after everybody had been taken in?

A. . . . .

We conducted interviews with all three—with all three suspects, two of which were actual interviews. The interview with Mr. Nicholson, he invoked his right to counsel and he was not—aside from being given his Miranda Warning, no further action was taken with him.

I then also obtained search warrants for hair, skin and DNA samples from all three suspects. I stood by and assisted the DPS crime lab when they processed the vehicle that the suspects had been driving in when the shooting occurred on Game Warden Shewmake. I also

---

**3.** Under Rule 802 of the Texas Rules of Evidence, the trier of fact is entitled to give probative value to otherwise inadmissible hearsay admitted without objection. *See Poindexter v. State,* 153 S.W.3d 402, 406 (Tex. Crim.App.2005). Once the trier of fact has weighed the probative value of unobjected-to hearsay evidence in its factfinding process, an appellate court cannot deny that evidence probative value or ignore it in its review of the sufficiency of the evidence. *Id.*

was involved in all the searches of the crime scenes, and involved in the actual recovery of this weapon.

I also coordinated with the pilots to obtain the flare video from the flare camera inside of the helicopter. I pretty much then put the whole case together.

Q. Okay. And did you come to any conclusions based on your investigation as to what happened? You said you were able to conduct interviews with the subjects. Did you also conduct interviews with the officers who were out there and involved in the shooting?

A. Yes, sir, I did.

Q. Okay. And based on those investigations and the things that you performed, were you able to base any conclusions as to if and which suspects committed these acts?

A. Yes, sir. We were able to conclude, based on interviews with two of the suspects that were very detailed, and also with the interviews of the officers, that Mr. Nicholson fired the weapon at officers on all three occasions.

Q. Okay.

A. And that the weapon was, in fact, in his possession from the time that they committed aggravated robbery in Woodville to the time that they were actually—he was actually captured and he left the weapon in the woods.

. . . .

Q. Okay. Do you know—you were out there the remainder of the evening after Mr. Nicholson was taken into custody?

A. Yes, sir, I was.

Q. Were any other shots fired that night?

A. No, sir.

. . . .

Q. [By (State)] This is going to be State's Exhibit Number 11. If you could please open that package and tell me what items those are.

A. [Witness complies.]

Q. Could you describe what those are?

A. Yes, sir. It appears to be a pair of blue pants. I'm not sure what brand they are. It appears to be a pair of— they are Haggar Generation pants, and—I'm not going to touch them, but there appears to be a pair of men's underwear inside the pants.

Q. Okay. And where were these collected from? Did you collect these?

A. No, sir, I did not.

Q. Okay. When did you come into possession of these?

A. I came into possession of these on the 23rd, when they were taken from the sheriff's [sic] department's evidence locker and given to the technicians with the DPS crime lab.

Q. Okay. And were [sic] one of the suspects wearing these pants?

A. The information that I was given was that these were the pants that were taken from Jason Nicholson at the time of his arrest.

On cross-examination, Sergeant Maskunas was asked to specify the three occasions his investigation revealed that appellant had fired shots, and Maskunas replied as follows:

A. [Maskunas] The shot that was fired at Game Warden Shewmake at the initial stop. The shot that was fired at Corporal Prince around—oh, probably around late 9:30, 9:45, somewheres around there. And then the shot that was fired at the officers, Chief Yoscow and Mike Taylor [sic], and other officers that were there. Those three—those three incidences.

▮▮▮ In assessing the legal sufficiency of trial evidence to support a conviction,

we consider all of the record evidence in the light most favorable to the verdict[4] and then determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found each of the essential elements of the offense proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Conner v. State,* 67 S.W.3d 192, 197 (Tex.Crim. App.2001). When conducting a sufficiency review, we consider all of the "light most favorable" evidence admitted, whether admitted properly or improperly. *Conner,* 67 S.W.3d at 197. *See also Moff v. State,* 131 S.W.3d 485, 488 (Tex.Crim.App.2004). When the record contains evidence circumstantial in nature, the standard of review is the same as it is for reviewing direct evidence.[5] *See Kutzner v. State,* 994 S.W.2d 180, 184 (Tex.Crim.App.1999). Indeed, circumstantial evidence alone may be sufficient to support a finding of guilt. *Id.*

 With regard to reviewing a trial record for factually sufficient evidence to support a criminal conviction, the question to be answered is: Considering all of the evidence in a neutral light, was the trier of fact rationally justified in finding guilt beyond a reasonable doubt? *See Zuniga v. State,* 144 S.W.3d 477, 484 (Tex.Crim.App. 2004). To facilitate answering this question, the Court of Criminal Appeals has set out two ways which trial evidence may be factually insufficient:

First, when considered by itself, evidence supporting the verdict may be too weak to support the finding of guilt beyond a reasonable doubt. Second, there may be both evidence supporting the verdict and evidence contrary to the verdict. Weighing all the evidence under this balancing scale, the contrary evidence may be strong enough that the beyond-a-reasonable-doubt standard could not have been met, so the guilty verdict should not stand. This standard acknowledges that evidence of guilt can "preponderate" in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt. Stated another way, evidence supporting guilt can "outweigh" the contrary proof and still be factually insufficient under a beyond-a-reasonable-doubt standard.

*Id.* at 484–85. Additionally, in a factual sufficiency review, courts of appeals are required to consider and discuss the most important evidence that the appellant claims undermines the verdict. *See Sims v. State,* 99 S.W.3d 600, 603 (Tex.Crim. App.2003). In keeping with the "common sense approach" suggested in Tex.R.App. P. 47.1, courts of appeals must "show their work" unless issuing a memorandum opinion. *Sims,* 99 S.W.3d at 603–04.

 In the instant appeal, appellant's lone argument for legal and factual insufficiency under both convictions is the State's failure to identify appellant as the

4. A "verdict" is defined by statute as "a written declaration by a jury of its decision of the issue submitted to it in the case." Tex.Code Crim. Proc. Ann. art. 37.01 (Vernon 1981) (emphasis added). "Verdict" by definition does not apply to a trial court's decision, although the word is used loosely in the statutes and case law. *See State v. Lewallen,* 927 S.W.2d 737, 739 n. 2 (Tex.App.-Fort Worth 1996, no pet.); *State v. Davenport,* 866 S.W.2d 767, 769 n. 2 (Tex.App.-San Antonio 1993, no pet.). For simplicity's sake, we will occasionally utilize the term "verdict" in this opinion ever-mindful that trial was to the judge, not to a jury.

5. "Circumstantial evidence is 'direct proof of a secondary fact which, by logical inference, demonstrates the ultimate fact to be proven.'" *See Cowan v. State,* 840 S.W.2d 435, 438 n. 10 (Tex.Crim.App.1992) (quoting *Taylor v. State,* 684 S.W.2d 682, 684 (Tex.Crim. App.1984)).

assailant. Appellant boils his argument down to the following:

In our case, one of the essential elements as alleged in the indictment is that Jason Nicholson is the individual who committed aggravated assault against Brad Prince, and attempted capital murder against Mike Wilson. However, the police officers never saw who shot at them. No co-defendant testified against the Appellant. No confession was introduced at trial. No scientific test linked Appellant to the crime by way of DNA tests, gunpowder tests, or any other test. No witness pointed the Appellant out in the courtroom and positively identified him as the individual involved in these offenses. No witness came forward and said they saw the Appellant shoot anyone. No witness came forward and testified that the Appellant was being criminally responsible for anothers' (sic) conduct under the law of parties. Therefore, no rational trier of fact could have found that it was actually the Appellant who committed these offenses. (footnote omitted).

In making this argument, appellant appears to entirely discount the fact that, as noted above, circumstantial evidence alone may also support a conviction. *See Kutzner*, 994 S.W.2d at 184. Circumstantial evidence is as probative as direct evidence in establishing an actor's guilt. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim. App.2004). Furthermore, under legal sufficiency review, we include all reasonable inferences in our consideration of the "light most favorable" evidence. *See Jackson*, 443 U.S. at 318–19, 99 S.Ct. 2781; *Sanders v. State*, 119 S.W.3d 818, 820 (Tex. Crim.App.2003). We are also permitted to look at events occurring before, during, and after the commission of the offense. *Guevara*, 152 S.W.3d at 49 (citing *Cordova v. State*, 698 S.W.2d 107, 111 (Tex.Crim. App.1985) and *Thompson v. State*, 697 S.W.2d 413, 416 (Tex.Crim.App.1985)). Each fact need not point directly and independently to the guilt of the appellant as long as the cumulative effect of all the incriminating facts are sufficient to support the conviction. *Guevara*, 152 S.W.3d at 49 (citing *Alexander v. State*, 740 S.W.2d 749, 758 (Tex.Crim.App.1987) and *Russell v. State*, 665 S.W.2d 771, 776 (Tex. Crim.App.1983)). As appellant presented no witnesses or evidence in his defense, we have only the testimony and physical evidence presented by the State.

As noted above, the State's case began with Game Warden Shewmake detailing the events before, during, and after the aggravated assault on him. Shewmake's testimony strongly indicated that it was appellant who fired the shot at him. This conclusion is based upon the notable dissimilarities between the physical appearance and clothing of appellant and of Carl Austin as described by Shewmake. As trier of the facts, the trial court was free to give great weight to this testimony as appellant was physically present in the courtroom for the trial court to observe. Furthermore, appellant's argument that no witness pointed appellant out in the courtroom and positively identified him as the individual involved in these offenses is highly misleading in that it entirely ignores the extensive circumstantial evidence indicating appellant was the assailant in all three incidents. From the time of his shooting at Game Warden Shewmake, appellant, accompanied by Carl Austin, was fleeing the authorities. The subsequent manhunt described by the State's witnesses was quite extensive and involved officers from several jurisdictions including the Texas Rangers. The manhunt included the use of tracking dogs, personnel on horseback, and a helicopter equipped with a type of sensor or tracking device that could apparently detect the body heat of

persons being tracked or searched for at night. At the point the gunshot was fired at Prince, and then later at Wilson, appellant and Carl Austin were still the only individuals involved. There was never any evidence raised from any source of the presence of a third, unknown person who could have been responsible for firing the shots. Wilson's testimony indicated that appellant surrendered very shortly after having shot in Wilson's direction, with Wilson being only about fifteen yards from appellant when the shot was fired.

 Finally, the testimony from Sergeant Maskunas, describing the subsequent capture of Carl Austin and the ensuing investigation, including interviews with Hooper and Austin, confirmed that appellant was the only one of the three original robbery suspects to have fired the shots at Warden Shewmake, Trooper Prince, and Deputy Wilson. Considering the evidence in the light most favorable to the verdicts, any rational trier of fact could have found appellant committed both offenses as alleged in the indictment. Additionally, taking all of the evidence in a neutral light, we again find the trial court was rationally justified in finding appellant guilty under both counts of the indictment. Considered by itself, the circumstantial evidence was certainly strong enough to support the verdicts beyond a reasonable doubt. Even fully considering the fact that neither Prince nor Wilson could positively say it was appellant who fired the shots at them, this does not so outweigh the remaining identification evidence from all sources that we must conclude the verdicts were not proven beyond a reasonable doubt. In other words, this is not a case where the

evidence supporting appellant's guilt on each count merely preponderates in favor of conviction but is otherwise insufficient under the beyond-a-reasonable-doubt standard in proving appellant was the assailant. Therefore, we find the evidence before the trial court legally and factually sufficient to sustain the convictions under both counts of the indictment.[6] We overrule the four appellate issues presented and affirm the judgments of conviction on both counts as alleged in the indictment.

AFFIRMED.

---

6. Although we find the evidence supports appellant's convictions as the primary actor under both counts of the indictment, we note that in a bench trial, the trial court may use the law of parties if the evidence supports that theory despite the absence of such allegations in the indictment. *Leon v. State*, 102 S.W.3d 776, 781–82 (Tex.App.-Houston [14th Dist.] 2003, no pet.); *Diaz v. State*, 902 S.W.2d 149, 151 (Tex.App.-Houston [1st Dist.] 1995, no pet.). *See generally Malik v. State*, 953 S.W.2d 234, 239–40 (Tex.Crim.App.1997).