Reginald **HOOPER**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 10–04–00265–CR.

Court of Appeals of Texas, Waco.

July 13, 2005.

Albert J. Charanza, Jr., Lufkin, for appellant.

Clyde M. Herrington, Lufkin, for appellee.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

BILL VANCE, Justice.

### I. Introduction

Appellant Reginald Hooper raises three issues to challenge his conviction by a jury of being a party to the offense of aggravated assault of a public servant and the thirty-year sentence assessed by the jury. Hooper's third issue complains of the legal sufficiency of the evidence to support his conviction. Because we hold that the evidence is legally insufficient to support Hooper's conviction, we will reverse and render a judgment of acquittal.

### II. Factual Background

Senaida Nash, the manager of the Cash 2 U store on Highway 69 in Woodville, testified that on March 17, 2004, at approximately 4:00 p.m., two men walked into the store and claimed they were conducting a cell phone survey. Nash did not see them pull up to the store in a car. One man—later identified as Carl Austin—was tall and thin and was wearing a red jersey, black shorts, and red and white tennis shoes. The other—later identified as Jason Nicholson—was wearing a white long-sleeve shirt. Nash testified that she knew Hooper, and neither of the men in the store was Hooper; she did not see Hooper at all that day. She knew Hooper because he had worked on the remodeling of some of Cash 2 U's stores.

While she was talking to the two men and after turning her back to them to receive a fax, Nash turned back around, and Austin had a gun pointed at her stomach and demanded money. Nash testified that she told him that the store didn't have any money. Austin took Nash to the back of the store and tied her hands and feet with duct tape. Nash said that Nicholson was in the front of the store and kept yelling to Austin to hurry, and then Austin told Nicholson that if he couldn't find anything, then they would take Nash's personal things. Austin took Nash's driver's license, cell phone, jewelry and $60 in cash. After gagging her, the two men left. Nash said the entire incident took no more than ten minutes.

Nash said that she was able to free her hands and feet from the duct tape, and she ran to the front of the store, just as a customer was walking in. Nash told him to call the police and that she had just been robbed. She asked him if he had seen anyone coming out of the store, and he said that he had not. The police soon arrived, and Nash gave a statement.

Betty Williams testified that on March 17, 2004, as she was pulling into a parking space in the Brookshires parking lot in Woodville (across Highway 69 from Cash 2 U, and not even a block away), a red car almost collided with her. She described the car as a red, four-door Dodge Shadow. As Williams's daughter opened her car door, a man with his shirt rolled up ran by her car, almost hitting the open car door. Williams described the man as wearing a red and black jersey and black shorts. He

got in the back seat of the red car and laid down, and the car sped out of the parking lot. Williams did not see which direction the red car went as it left the Brookshires parking lot.

Williams could not identify the driver of the red car, and she said that she saw only one man running to the car. Williams testified that she had never seen Hooper before and did not recognize him in court. Williams's testimony about how many people were in the red car was somewhat unclear, but from our review of the record,[1] it appears that she saw only two men—the man who was running and got into the car, and the driver.

Williams then saw police going to Cash 2 U and went over to ask if there had been a robbery. When told that there had been a robbery, Williams gave the police descriptions of the red car and the man who was running and his clothing.

Deputy Lawrence Hicks of the Tyler County Sheriff's Department responded to the call of a robbery at the Cash 2 U. He obtained a description of the suspects from Nash and then went to his patrol car to use his radio to broadcast their description. Hicks testified that Williams came up to him in the parking lot of Cash 2 U and told him that she had just seen two black males get into a red Dodge Shadow at Brookshires. On cross-examination, Hicks testified that he later obtained a written statement from Williams and that the statement indicated that she saw only one man running to the car.

Hicks then broadcast a description of the suspects' car over his radio. He soon got a radio report from Game Warden Trey Shewmake that he had located the red car. Hicks also determined Shewmake's location. During Shewmake's radio report, Hicks heard gunfire over the radio, so he drove immediately to Shewmake's location. When Hicks arrived, Shewmake and the red Dodge Shadow were there. Hooper was sitting in the front passenger seat of Shewmake's truck with his hands cuffed behind his back.

Shewmake, a game warden with the Texas Parks and Wildlife Department and a certified peace officer, testified that on the afternoon of March 17, he was driving south on Highway 69 toward Woodville from Lufkin. He heard a radio dispatch of an armed robbery in Woodville involving two suspects—two black males—possibly in a red Dodge Shadow, with one suspect wearing a red jersey. Just after he had crossed the Neches River—the county line between Tyler County and Angelina County—Shewmake said that a small red car traveling north on Highway 69 in the opposite direction passed him. Shewmake saw only one person in the car—the driver— and he was not sure if the car was a Dodge Shadow. He thus turned his game warden patrol truck around to follow the red car and get a better look at the car. He described his truck as having a large game warden decal on both doors and red and blue lights on both the front of the truck and on the headache rack along the top of the cab.

Shewmake testified that, after turning around to catch up to the red car, he had

---

1. Q. Okay. Tell me about that. You saw— how many individuals did you see in the car?

 A. Two.

 Q. Okay. And you saw one individual running on foot?

 A. I did.

 Q. What was he wearing?

 A. A red and black jersey, black shorts.

 Q. Okay. And you said there were two people in the car. Who was the other individual?

 A. I don't really know because he was the driver. I was basically focusing on the one running.

 Q. So you didn't get a good look at the driver?

 A. No, I didn't get a good look at him?

to drive over 100 m.p.h. because the red car appeared to accelerate. It took him a few minutes to catch up, and then he followed the red car for about four or five miles while going between 60 and 70 m.p.h. Shewmake did not activate his lights or siren, as he said he was just trying to get a better look at the car to see if it was the suspect car. Shewmake was able to see that one person was in the car, and that was the driver, a black male. Shewmake was able to read the license plate number, which he radioed to the dispatcher. At the same time, the red car began to slow down to 40 to 50 m.p.h. and moved over to the right with the two right tires over the shoulder, similar to a driver moving over to let a car pass. Shewmake testified that the red car's actions were strange and erratic and that he thus began to think that this might be the suspect car.

As the red car continued to slow down to about 25 m.p.h., Shewmake received radio confirmation that the car was in fact a Dodge. At that point, the red car completely pulled over and stopped quickly, and as it pulled over, Shewmake activated his red and blue lights. Shewmake testified that almost immediately, the heads of two other persons popped up and he realized that they had been lying down in the car and that he had a "situation." He radioed to his dispatcher that he was going to be out of his truck with a car.

Shewmake testified that at the same time as he was getting out of his truck, the two passengers in the red car opened their doors almost simultaneously, with the rear passenger getting out a split second before the front passenger. Shewmake said that the rear passenger—Austin—was wearing a red basketball jersey and black shorts. He yelled at Austin to get back in the car, but Austin began moving to the front of the car. At the same time, the front passenger—Nicholson—was getting out of the car. Shewmake said that he realized he was in a bad situation and reached in his truck to get his radio microphone to call for help. While Shewmake was pulling his microphone toward his face and also pulling his pistol out of the holster, Nicholson, who was about twenty-five feet away, raised a pistol and shot once at Shewmake's head but missed. The driver was still in the red car when Nicholson shot at Shewmake.

Shewmake squeezed his microphone and called for help and returned fire, all at the same time, firing eleven shots toward Nicholson until he thought that Nicholson was no longer going to shoot back. Two of Shewmake's shots hit the car. When Shewmake began shooting, Nicholson ducked and began to move away to the front of the car, where Austin was. While Shewmake was shooting, the driver—Hooper—opened his door, dived on the ground onto his hands and knees, and looked at Shewmake and yelled, "Don't kill me" or "Don't shoot me." On cross-examination Shewmake said that being on the ground was probably the safer place for Hooper to be and that Hooper appeared frightened and scared. Nicholson and Austin fled into the woods. Shewmake approached Hooper, reloading his pistol and telling Hooper to stay on the ground. When he felt sure that the other two men were not going to return and shoot at him, Shewmake handcuffed Hooper and frisked him for weapons, finding that Hooper had no weapons on his person. Shewmake said that Hooper never pulled a gun on him. Later during the official search of the car, a pistol was found on the rear floorboard behind the driver's seat, where Austin had been.

While Shewmake was waiting for help to arrive, two citizens stopped and offered to

assist. Shewmake had one of them hold on to Hooper's handcuffs to prevent him from running while Shewmake got on his radio to report what had happened. Other officers arrived approximately eleven minutes after the shooting.

While waiting for help to arrive, Shewmake placed Hooper in his truck, securing him with a seatbelt. Shewmake got Hooper's identification from his pocket and was able to identify him as Hooper. With the citizens watching Hooper, Shewmake then went to a nearby house to insure that Nicholson and Austin had not gone into it and that any occupants were safe. After determining that no one was home, Shewmake went back to his truck and took control of Hooper. Shewmake testified that when other officers arrived, they took Hooper out of his truck and placed him in a patrol car.

On cross-examination, Shewmake said that Hooper never tried to run, never threatened him, never gave him any problems, never resisted, and never gave a bad attitude. He testified that he told Hooper while he was handcuffing him, "You're doing good." The citizens who watched Hooper while Shewmake searched the nearby house did not report any problems with Hooper to Shewmake.

Eventually, around 100 law enforcement officers, two packs of dogs from a nearby prison, and a helicopter with a thermal-imaging camera converged on the area to assist in the manhunt for Nicholson and Austin in the woods. Nicholson surrendered that night around 10:30 p.m., and Austin surrendered the next morning around 7:05 a.m. Neither was armed when they surrendered, but a 9 mm semi-automatic pistol was found in the vicinity of Austin's surrender. Other items found in a search of the woods were a roll of duct tape matching that used on Nash in the robbery and the set of Cash 2 U keys taken in the robbery.

## III. Standard of Review

■ Hooper's third issue complains of the legal sufficiency of the evidence to support his conviction as a party to the offense of aggravated assault of Shewmake. When reviewing a challenge to the legal sufficiency of the evidence to establish the elements of a penal offense, we must determine whether, after viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The standard is the same for both direct and circumstantial evidence cases. *Kutzner v. State*, 994 S.W.2d 180, 184 (Tex. Crim.App.1999).

■ We do not resolve any conflict of fact or assign credibility to the witnesses, as this was the function of the trier of fact. *See Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.Crim.App.1999); *Adelman v. State*, 828 S.W.2d 418, 421 (Tex.Crim.App.1992); *Matson v. State*, 819 S.W.2d 839, 843 (Tex. Crim.App.1991). Instead, our duty is to determine if the findings of the trier of fact are rational by viewing all of the evidence admitted at trial in the light most favorable to the verdict. *Adelman*, 828 S.W.2d at 422. In so doing, any inconsistencies in the evidence are resolved in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex.Crim.App.2000); *Matson*, 819 S.W.2d at 843.

## IV. Applicable Law

Hooper was convicted of being a party to the offense of aggravated assault of a public servant.

### A. Aggravated Assault of a Public Servant

A person commits the offense of aggravated assault of a public servant if the

person intentionally or knowingly threatens another with imminent bodily injury and the person uses or exhibits a deadly weapon during the commission of the offense, and the offense is committed against a person who the actor knows is a public servant while the public servant is lawfully discharging an official duty. TEX. PEN. CODE ANN. §§ 22.01(a)(2), 22.02(a)(2), (b)(2) (Vernon Supp.2004–05).

### B. The Law of Parties

Under the law of parties, a person may be convicted as a party to an offense if the offense is committed by his own conduct or by the conduct of another for which he is criminally responsible. *Id.* § 7.01(a) (Vernon 2003). The penal code provides two ways by which a person may be criminally responsible for another's conduct: (1) by being a "party" to the offense under section 7.02(a); or (2) by being part of a conspiracy to commit a felony under section 7.02(b). *See id.* § 7.02(a), (b).

### 1. Acting with Intent to Promote or Assist

■ Section 7.02(a)(2) provides that a person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2); *see Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex.Crim. App.2005). To convict a defendant as a party to an aggravated offense, the State must prove that the defendant was criminally responsible for the aggravating element. *Wooden v. State*, 101 S.W.3d 542, 547–48 (Tex.App.-Fort Worth 2003, pet. ref'd) (citing *Stephens v. State*, 717 S.W.2d 338, 340 (Tex.Crim.App.1986)). In other words, the defendant must have, with intent to promote or assist the aggravated

assault, solicited, encouraged, directed, aided, or attempted to aid the other person in committing the aggravated assault. *Id.*

■ When an appellant raises a legal sufficiency complaint as an offender convicted as a party, the evidence will be held sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement. *Ransom v. State*, 920 S.W.2d 288, 302 (Tex.Crim.App.1994); *Cordova v. State*, 698 S.W.2d 107, 111 (Tex.Crim.App.1985). "In determining whether the accused participated as a party, the court may look to events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Cordova*, 698 S.W.2d at 111. Circumstantial evidence may be used to prove party status. *Id.*

■ The evidence must show that at the time of the offense, the parties were acting together, each contributing some part towards the execution of their common purpose. *Brooks v. State*, 580 S.W.2d 825, 831 (Tex.Crim.App. [Panel Op.] 1979); *Armstead v. State*, 977 S.W.2d 791, 797 (Tex.App.-Fort Worth 1998, pet. ref'd). For a defendant to be considered a party to an offense, he must commit some culpable act before or during the commission of the offense. *See Morrison v. State*, 608 S.W.2d 233, 235 (Tex.Crim.App. [Panel Op.] 1980). In determining the legal sufficiency of the evidence to show the defendant's intent, if the record supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution."

*Matson,* 819 S.W.2d at 846; *see also Armstead,* 977 S.W.2d at 797.

### 2. Conspiracy

The second way that a person can be criminally responsible for another's conduct is found in section 7.02(b), which provides that if, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy. TEX. PEN.CODE ANN. § 7.02(b). The term "conspiracy" is defined as an agreement between two or more persons, with intent that a felony be committed, that they, or one or more of them, engage in conduct that would constitute the offense. *Id.* § 15.02(a). An agreement constituting a conspiracy may be inferred from acts of the parties. *Id.* § 15.02(b).

### V. Analysis

The evidence clearly establishes that it was Nicholson, not Hooper, who shot at Shewmake. Plainly, no rational juror could have found beyond a reasonable doubt that Hooper shot at Shewmake; the evidence was legally insufficient to support Hooper's conviction as a primary actor.[2] *See Tippitt v. State,* 41 S.W.3d 316, 323 (Tex.App.-Fort Worth 2001, no pet.). Therefore, in finding Hooper guilty of aggravated assault of a public servant, the jury necessarily concluded *either* that Hooper intended to promote or assist Nicholson in the commission of the aggravated assault of Shewmake by soliciting, encouraging, directing, aiding, or attempting to aid Nicholson in the commission of the offense, *or* alternatively, that in facilitating a conspiracy to commit robbery, Hooper should have anticipated Nicholson's aggravated assault of Shewmake. We find that the evidence is legally insufficient to support a finding under either theory of criminal responsibility.

### A. Acting with Intent to Promote or Assist

 First, the evidence is legally insufficient to establish Hooper's promotion or assistance in Nicholson's aggravated assault of Shewmake. *See* TEX. PEN.CODE ANN. § 7.02(a)(2). Hooper cannot be found guilty as a party to the aggravated assault of Shewmake under section 7.02(a)(2) without legally sufficient evidence that he was present and "acting with intent to promote or assist the commission of" aggravated assault of a public servant. *See Tippitt,* 41 S.W.3d at 324 (quoting TEX. PEN.CODE ANN. § 7.02(a)(2) and citing *Martinez v. State,* 763 S.W.2d 413, 425 n. 5 (Tex.Crim.App. 1988)). Hooper's criminal responsibility for another's conduct does not extend further than that which he specifically intended to promote in aiding Nicholson and Austin—in this case, the robbery. In other words, even if the evidence established Hooper's criminal responsibility by aiding the robbery, his criminal responsibility for the robbery would not establish his criminal responsibility for Nicholson's later aggravated assault of Shewmake. *See id.* (evidence of appellant's plan and aid to commit robbery was legally insufficient to show his encouragement and intent to commit capital murder); *see also Wooden,* 101 S.W.3d at 547–49 (evidence of appellant's intent to promote or assist attempted theft as lookout was not legally suffi-

---

**2.** Nicholson was convicted of the aggravated assault of Shewmake, received a life sentence, and did not appeal that conviction. *See Nicholson v. State,* 162 S.W.3d 389, 391 (Tex. App.-Beaumont 2005, pet. filed) (affirming Nicholson's convictions and life sentences for aggravated assault and attempted capital murder offenses against two other law enforcement officers that occurred in the subsequent manhunt for Nicholson and Austin).

cient to support conviction for subsequent aggravated assault).

The direct evidence before the jury was that Hooper was driving the getaway car for the five minutes that Shewmake was observing the car, which was approximately thirty minutes after the robbery. There was no direct evidence that Hooper was at or near the scene of the robbery, *i.e.*, the Cash 2 U premises, or that Hooper was driving the red car when Austin ran and got into it.[3] But for purposes of our legal sufficiency review of all the evidence in the light most favorable to the verdict, we will assume that the jury made the inference that Hooper was the driver of the getaway car at the time of the robbery based on the circumstantial evidence that he was driving it about thirty minutes later and the two robbers were lying down in it.

■■■ There was no direct evidence that, before Nicholson shot at Shewmake, Hooper knew that Nicholson had a gun, and there was no direct evidence that Hooper knew there was another gun on the floorboard behind the driver's seat. There was no evidence that Hooper acted with intent to promote or assist Nicholson in his shooting at Shewmake or that Hooper solicited, encouraged, directed, aided, or attempted to aid Nicholson in the shooting. In summary, the evidence shows that Hooper was driving the getaway car and that he was present when Nicholson shot at Shewmake. Other than Hooper's presence and driving of the getaway car, there was no evidence of any action by Hooper or any circumstance that showed his intent to promote or assist Nicholson's shooting at Shewmake.[4] *See id.* Shewmake did testify about Hooper's conduct at the scene of the shooting, and his conduct was directly opposite to that which would show such an intent—Nicholson shot at Shewmake and he and Austin fled, but Hooper immediately surrendered, diving to the ground and yelling at Shewmake not to shoot him.

The evidence of a plan or agreement viewed in the light most favorable to the verdict only established a plan or agreement to rob the Cash 2 U store, not a plan or agreement to shoot at pursuing law enforcement officers. While the jury could have inferred that Hooper was the driver of the getaway car and thus intended to promote or assist the robbery, we will not indulge in another inference that Hooper, by his presence and as driver of the getaway car, intended to promote or assist Nicholson's shooting at Shewmake.[5] Such a scenario would require us to stack an inference upon an inference, and when conducting a legal sufficiency review, a vital fact may not be established by stacking inference upon inference. *Id.* at 327; *Richardson v. State*, 834 S.W.2d 535, 537 (Tex.App.-Houston [1st Dist.] 1992, pet. ref'd) (op. on reh'g).

### B. Conspiracy

■■■ Turning to the second basis for criminal responsibility for the conduct of

---

**3.** In its brief, the State asserts that the jury heard testimony from Nash and Williams that placed Hooper in the driver's seat of the red car used to flee the robbery, but the State does not cite the record in making this assertion, which in any event is simply not supported by the record. Nash, who knew Hooper, testified that she didn't see him at all that day, that he was not one of the two robbers, and that she didn't see the robbers' car. Williams testified that she saw only two persons in the red car—Austin and an unidentified driver—when she observed it across the highway from Cash 2 U after the robbery.

**4.** Standing alone, proof that an accused was present at the crime scene is insufficient to sustain a conviction. *Thompson v. State*, 697 S.W.2d 413, 417 (Tex.Crim.App.1985) ("Of course, mere presence of a person at the scene of the crime, either before, during, or after the commission of the offense, or even flight from the scene, without more, is insufficient to sustain a conviction of one as a party to the offense.").

**5.** *Cf. Cunningham v. State*, 982 S.W.2d 513, 519–20 (Tex.App.-San Antonio 1998, pet.

another, although the evidence in the light most favorable to the verdict establishes that Hooper drove the getaway car and thus was a party to the Cash 2 U robbery, the evidence is legally insufficient to support a finding that the aggravated assault of Shewmake was an offense that was committed in furtherance of the robbery and Hooper should have anticipated that offense as a result of his agreeing to aid the robbery. *See* TEX. PEN.CODE ANN. § 7.02(b). As a comparison, where appellate courts have found legally or factually sufficient evidence to uphold a capital murder conviction under section 7.02(b), there has been evidence that the appellant was *on notice* that murder was a possible result of the carrying out of a felony to commit another felony. *Tippitt,* 41 S.W.3d at 324–25 (detailing cases). In this case, there was no direct evidence to establish Hooper's knowledge of Nicholson's violent propensity or of his or Austin's intent to evade arrest by shooting at Shewmake. *Cf. id.* at 325–26. Without such evidence, the evidence before the jury was legally insufficient to establish beyond a reasonable doubt that Hooper should have anticipated Nicholson's shooting at Shewmake. Speculation would be required for the jury to infer from Hooper's driving the getaway car that Hooper knew or should have anticipated that Nicholson would shoot at Shewmake. A jury, however, may not reach a verdict based on speculation. *Johnson v. State,* 673 S.W.2d 190, 196 (Tex.Crim.App.1984); *Tippitt,* 41 S.W.3d at 326. Additionally, Hooper's conduct during and after the stop, as testified to by Shewmake, was directly inconsistent with

one who should have anticipated or in fact did anticipate Nicholson's shooting.

Hooper's driving of the getaway car does not alone support a rational inference beyond a reasonable doubt that Hooper should have anticipated Nicholson's shooting at Shewmake. *See Tippitt,* 41 S.W.3d at 327 (defendant's agreement or acquiescence in robbery would not support rational inference beyond a reasonable doubt that he should have anticipated murder of robbery victim by actor). We agree with the Second Court of Appeals that robbery is not an offense of such a violent nature that murder should *always* be anticipated as a potential result of its commission; thus, aggravated assault of a pursuing peace officer also should not *always* be anticipated as a potential result of a robbery. *Id.* at 326.

Furthermore, to convict Hooper as a party under section 7.02(b), the jury would have to infer not only that Hooper was the driver of the getaway car at the time of the robbery, but also that he knew or was on notice—and thus should have anticipated—that Nicholson would shoot at a law enforcement officer to evade arrest. This scenario must be rejected because it would require us to impermissibly stack an inference upon an inference to establish a vital fact. *Id.* at 327.

## VI. Conclusion

 The factfinder's determination of Hooper's guilt beyond a reasonable

ref'd) (evidence of defendant's membership in gang with the two identified shooters, park ranger's statement and complainant's testimony that defendant appeared to have a gun as he fled scene, and other ranger's testimony that he saw five to seven men standing with arms outstretched and three of them with guns and defendant thus may have at least been pointing for shooters, was legally sufficient to establish that defendant at least en-

couraged commission of aggravated assault and thus was party to it); *cf. also id.* at 525–26 (Duncan, J., dissenting) (stating that inference that defendant encouraged aggravated assault was speculation but in any event was not sufficient evidence beyond a reasonable doubt—inference was only some or a "modicum" of evidence—that defendant encouraged aggravated assault).

doubt cannot be overturned unless it is found to be irrational. When we are faced with a record that supports conflicting inferences, we must presume that the trier of fact resolved such conflicts in favor of the prosecution and must defer to that resolution. *Matson,* 819 S.W.2d at 846; *Moreno v. State,* 755 S.W.2d 866, 867 (Tex. Crim.App.1988). We recognize our duty to consider all the evidence admitted at trial before deciding whether there was sufficient evidence to prove the elements of the offense. *Villalon v. State,* 791 S.W.2d 130, 132 (Tex.Crim.App.1990). Furthermore, we do not sit as a thirteenth juror in assessing the evidence under our legal sufficiency analysis. *See Moreno,* 755 S.W.2d at 867. But in this case, nothing more than speculation or impermissible inference-stacking supports the State's contention that Hooper acted with intent to promote or assist, or should have anticipated, Nicholson's aggravated assault of Shewmake. *See id.* at 326–27.

In conclusion, viewing all of the evidence in the light most favorable to the verdict and giving full play to the responsibility of the factfinder fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts, but disallowing inference stacking and speculation, we hold that no rational factfinder could have found the essential elements of the crime beyond a reasonable doubt under the law of parties. *See Jackson,* 443 U.S. at 318–19, 99 S.Ct. at 2788–89; *Santellan v. State,* 939 S.W.2d 155, 160 (Tex.Crim.App.1997). The evidence, as a whole, was legally insufficient for a rational factfinder to find that Hooper was a party to aggravated assault of a public servant. *See, e.g., Wooden,* 101 S.W.3d at 548–49; *Tippitt,* 41 S.W.3d at 323–28; *Navarro v. State,* 776 S.W.2d 710, 712 (Tex.App.-Corpus Christi 1989, pet. ref'd).

We sustain Hooper's third issue. Because by sustaining Hooper's third issue we must render a judgment of acquittal, we do not address his first and second issues. *See* TEX.R.APP. P. 47.1. Having sustained Hooper's third issue, we reverse the judgment and render a judgment of acquittal.

Chief Justice GRAY, dissenting.

TOM GRAY, Chief Justice, dissenting.

Call me, along with 12 jurors and the trial court, irrational.

Hooper was driving the getaway car. After Hooper knew he was being followed by law enforcement, his driving became somewhat erratic until he slowed and suddenly stopped before the following officer even activated his emergency lights. During this time it is undisputed that two other persons were in the car, concealing themselves from public view, one in the front side passenger area. The one in the front side passenger area exited the car, gun in hand, and shot at the officer, a game warden, who had pulled up behind them. By stopping the car at the time, manner, and location that he did, Hooper is the one who chose the timing and location of the ensuing gun battle between the front seat passenger and the game warden.

I think the inferences necessary to affirm the conviction for aggravated assault of a public servant are reasonable and firmly supported by this record. Thus, I totally disagree with the majority opinion and judgment and, more specifically, the statement by the majority that "Hooper's conduct during and after the stop ... was directly inconsistent with one who should have anticipated or in fact did anticipate Nicholson's shooting." If that were the case, it would have been entirely reasonable to expect Hooper to pull into his mother's driveway and stop for milk and cookies and his afternoon nap.

I dissent.